06 CV 2448

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X

FIRST INDEPENDENT INCOME NOTES, LLC and
FIRST EXCELSIOR NOTE FUND, LLC,

                         Plaintiffs,

            vs.                                      **COMPLAINT**

PALI CAPITAL, INC., RENEGADE TECHNOLOGY
GROUP, INC., JAMES T. VERBIC,
BRENDA J. VERBIC, COCHISE ATM FUND, LLC,           06 Civ. ____ ( )
CHEROKEE ATM FUND, LLC, POCAHONTAS
ATM FUND, LLC, and APACHE ATM FUND, LLC,           **JURY TRIAL
                                                   DEMANDED**

                         Defendants.
--------------------------------------------------------------------X

      Plaintiffs FIRST INDEPENDENT INCOME NOTES, LLC ("FIIN") and FIRST

EXCELSIOR NOTE FUND, LLC ("FENF") (also referred to alternatively and jointly as the

"Note Funds" or "Lenders"), by their attorneys, Gersten Savage LLP, for their Complaint against

the Defendants, PALI CAPITAL, INC., ("Pali"), RENEGADE TECHNOLOGY GROUP, INC.

("Renegade"), JAMES T. VERBIC, individually, BRENDA J. VERBIC, individually, (jointly

the "Verbics"), COCHISE ATM FUND, LLC, ("Cochise"), CHEROKEE ATM FUND, LLC

("Cherokee"), POCAHONTAS ATM FUND, LLC ("Pocahontas"), and APACHE ATM FUND,

LLC ("Apache"), hereby allege as follows:

                         NATURE OF THE CASE

      1. In March 2003, Pali was hired to serve and did serve as an investment advisor and,

ultimately, as a placement agent for a series of secured, non-rated notes ("Notes"), guaranteed by

Renegade, in connection with six wholly owned special purpose limited liability companies

("LLCs") formed by Renegade. The Notes were represented to be secured by automatic teller machines ("ATMs"), contracts for the placement of the ATMs, the revenue generated by the use of the ATMs and other assets of Renegade and the LLCs.

2. Pali, as placement agent for the Notes, had a duty to ensure that, among other things, the financial statements of the LLCs and Renegade were true and accurate; the statements contained in the placement documents were true and accurate; and there was no ongoing fraud, conversion or other self-dealing then occurring at Renegade.

3. Pali, as agent for the lenders to each of the LLCs, and more particularly to the Plaintiffs as Lenders to Defendants Cochise and Cherokee, had fiduciary duties as follows (among other things): (a) to ensure that the security for the Notes, and particularly the ATMs that served as collateral security, was in place prior to the closing and release of the Notes for sale, (b) to ensure that a segregated account was established by and for each LLC for the benefit of the Lender so that the funds generated by the use of the ATMs was deposited into that segregated account, (c) to ensure that security for the Notes remained in place under the terms of the security agreement, (d) to enforce the rights of each Lender and to control and monitor and otherwise ensure that the funds and fees did go into segregated accounts, and (e) to take such timely action as was necessary to enforce each Lender's rights and protect each Lender's security.

4. Pali breached its duties by failing, after having actual and direct knowledge of Renegade's breaches, to ensure that segregated accounts were maintained and that security for the Notes was maintained; and by failing to take timely action to enforce and protect each Lender's rights and security.

2

5. Pali further breached its duties to the Lenders by entering into an undisclosed compensation agreement to receive warrants to acquire up to a twenty percent interest in Renegade and a subsequent agreement with Renegade to receive warrants to acquire shares representing up to twenty percent of a new company into which Renegade would transfer all of its interest in the four LLCs previously placed by Pali (Arapahoe, Cherokee, Cochise and Geronimo), thus giving it a proprietary interest in conflict with its fiduciary duty to the Lenders. Pali concealed its actions and placed its financial gains ahead of its duties as an agent of the Lenders.

6. Upon information and belief, from sometime in 2003, the exact date being unknown to plaintiffs, through February 2005, Renegade, the Verbics and, upon information and belief, others whose identities are presently unknown to Plaintiffs, in conjunction with the LLCs, were systematically looting the LLCs, converting money to their own use, co-mingling funds from the various LLCs, using money from subsequent private placements to pay debts and money due on prior transactions and otherwise engaging in a fraud.

7. All defendants other than Pali are sometimes referred to below as "the Renegade Defendants." Upon information and belief, Pali aided and abetted the fraud of the Renegade Defendants by its action and inaction, negligence, and other misconduct, and permitted the Renegade Defendants to engage in an extensive series of transactions that were fraudulent as to creditors, illegal and unauthorized.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction over all claims set forth herein as an action arising under the securities laws of the United States and the Securities Exchange Act of 1934.

9. This Court has subject matter jurisdiction over all other claims set forth herein under the doctrines of pendent and supplemental jurisdiction.

10. Pursuant to Fed. R. Civ. P. 4(k)(1)(A), this Court has personal jurisdiction over Pali pursuant to the laws of the State of New York because it maintains its principal place of business in New York at 650 Fifth Avenue, New York, N.Y. 10019 and is therefore subject to the jurisdiction of a New York court of general jurisdiction.

11. This Court has personal jurisdiction over Cochise and Cherokee in that they have each consented to the jurisdiction of the Courts of the State of New York and the United States District Court for this State, the proceeds of the loans evidenced by the Notes were disbursed within the State of New York, and a substantial part of each transaction took place within the State of New York.

12. This Court has personal jurisdiction over Pocahontas and Apache in that upon information and belief, they have each consented to the jurisdiction of the Courts of the State of New York and the United States District Court for this State, the proceeds of the loans evidenced by the Notes were disbursed within the State of New York, a substantial part of each transaction took place within the State of New York, each one was funded through Pali in New York, and Pali has acted and continues to act as agent within the State of New York for each LLC.

13. This Court has personal jurisdiction over James Verbic in that, upon information and belief, he guaranteed the obligations of one or more of the LLCs, including punctual payment and performance, and agreed that the guarantee was intended to be and was an instrument for the

4

payment of money only as that phrase is used in CPLR §3213; and the guarantee was negotiated in the State of New York and accepted in the State of New York and the loan proceeds were to be disbursed within the State of New York.   Upon information and belief, James Verbic traveled into the State of New York to perpetrate, aid and abet and otherwise commit certain of  the unlawful and actionable activities set forth herein.  Upon information and belief, James Verbic acted on behalf of himself and the marital entity.

14.  This Court has personal jurisdiction over Brenda Verbic in that, upon information and belief, she participated in the fraud and received funds and proceeds that were to be disbursed within the State of New York to the Plaintiffs.   Upon information and belief, Brenda Verbic traveled into the State of New York to perpetrate, aid and abet and otherwise commit certain unlawful and actionable activities set forth herein in furtherance of the conspiracy.  Upon information and belief their marital entity is liable for their joint and several activities.

15.  Venue is proper within the Southern District of New York in that, upon information and belief, Defendant Pali resides and is otherwise found within this District and a substantial part of the events, actions and omissions giving rise to the claims occurred within this District.

<u>THE PARTIES</u>

16.  Plaintiff FIIN was, at all times, a single purpose limited liability company, having its principal place of business c/o McGinn Smith, One Capital Center, Albany, New York.

17.  Plaintiff FENF was, at all times, a single purpose limited liability company, having its principal place of business c/o McGinn Smith, One Capital Center, Albany, New York.

18.  Defendant Pali was, at all times, a Delaware corporation and is an NASD and SEC regulated broker-dealer with its principal offices at 650 Fifth Avenue, New York, New York. Pali, acting through one of its principals, Herbert Soroca, contracted with Defendant Renegade to

act as an investment advisor for Renegade and a placement agent for the series of Notes hereinafter more fully described.

19.  Defendant Renegade was, at all times, an Arizona Limited Liability Company with its principal place of business in Maricopa County, Arizona.

20.  Defendants Cochise and Cherokee were, at all times, Delaware Limited Liability Companies with their principal places of business at 7332 East Earll Drive, Scottsdale, Arizona. Cochise and Cherokee were and are single purpose entities each created for a specific Note transaction and were wholly owned subsidiaries of Renegade.

21.  Upon information and belief, Defendants Pocahontas and Apache were, at all times, Delaware Limited Liability Companies with their principal places of business at 7332 East Earll Drive, Scottsdale, Arizona.  Pocahontas and Apache were single purpose entities each created for a specific Note transaction and were wholly owned subsidiaries of Renegade.

22.  Defendants James Verbic and Brenda Verbic are husband and wife.  James Verbic was and is the Chairman of Renegade and its founder. Brenda Verbic was and is a member of the Board of Directors of Renegade.  The Verbics are principal shareholders of Renegade.

Background of the Transactions

23.  Upon information and belief, James Verbic first met with Soroca and Pali in March 2003 to discuss the purported needs of Renegade.  Mr. Verbic told Soroca that Renegade needed financing to acquire Automated Teller Machines ("ATMs") and place those machines in locations where Renegade would have a contract in place with the owner of the location to provide ATM services.  The owner of the location would participate in revenue sharing from the funds derived by the ATMs at the owners' locations.  Soroca thought the opportunity was sufficient to pursue and undertook to have the opportunity evaluated.

6

24. Upon information and belief, representatives of Pali met with Verbic in April 2003. During this meeting, Verbic described the mechanics of a typical transaction. When a customer would use an ATM, the ATM would connect to a Processor that would network with a customer's financial institution to confirm funds availability. Once confirmed, the ATM would dispense cash to the customer; appropriate information would be sent to the customer's financial institution; and two revenue streams would be created from the customer's financial institution.

25. Verbic represented that the first revenue stream was Surcharge Revenue, the amount the ATM informs the customers they will be charged for the transaction, typically $2.00. The second revenue stream was Interchange Revenue, a fee typically paid by the customer's financial institution, unbeknownst to the customer, typically $0.55. The Processor would automatically divert the Surcharge Revenue on a daily (or periodic) basis to any account indicated in the contract between the Processor and Renegade, or any Renegade-controlled entity.

26. Verbic's proposed structure for the funding was that a single purpose limited liability company ("LLC"), wholly owned by Renegade, would be created for each Note transaction with Renegade as the Managing Member. A lock-box, segregated bank account for each specific LLC would receive all of the Surcharge Revenue. That Surcharge Revenue would be used exclusively for the required payments to the lenders to the LLC. The Interchange Revenue would accumulate at the Processor and be distributed to the lock-box, segregated bank account for the specific LLC once per month.

27. Verbic represented and proposed that costs associated with the transactions performed at ATMs assigned to the LLCs would receive first payment. These costs would include the Processor Fee, Cost of Cash, Phone Line, Armor Servicing Fees, Vendor Location Participation and Insurance ("Costs"). After Costs were paid, the balance of the Revenues would

7

be distributed to the lenders to the LLCs. After all principal and interest payments due the lenders to the LLCs were satisfied, then any excess cash in the lock-box, segregated bank account for the specific LLC would be distributed to Renegade, the managing member. Additionally, security interests and UCC-1 filings would be obtained on all ATMs financed by the each lender's funds. The contracts with the owners of the locations where the ATMs were located would also be pledged by the LLCs, and Renegade, the parent entity, would guarantee the loans made to each LLC.

Pali's Role and Relationship to Renegade

28. Upon information and belief, in or about June 2003, Pali entered into an investment contract with Renegade whereby Pali contracted to secure the financing necessary to permit Renegade to complete its business strategy and Pali served as placement agent for each offering of Notes on each of the financings that it raised. Upon information and belief, Pali provided funds to LLCs formed by Renegade, sold the Notes issued by the various LLCs to various individuals and entities through term sheets, private placement memoranda and subscription agreements ("PPMs"), and represented to each lender that it was only going to receive compensation, in the form of a dollar sum in fees, based on a percentage of the capital it raised. Each lender, including the Plaintiffs, was advised that the only fees to be paid or otherwise given to Pali were to be six percent of the capital raised with an additional two percent for expenses.

29. Upon information and belief, as an integral part and inducement to the lenders, Pali represented that it would serve as the agent for each and every lender in each of the Note transactions, would act as agent on behalf of the holders of the Notes and would administer the terms and conditions of the Notes and related agreements. It created a fiduciary relationship and obligation towards each lender and particularly to the Plaintiffs.

8

30.  Upon information and belief, as an integral part and inducement to the Lenders, Pali represented that all cash flow generated by the ATMs would be deposited into a blocked cash collateral account from which cash, monthly installments of interest and amortization would be paid in each of the Note transactions in which Lenders were participants.  Pali represented that it would administer the terms and conditions of the Notes and related agreements.  It created a fiduciary relationship and obligation towards each Lender to ensure that such lock box facilities and accounts were created and maintained.

31.  All of the above was designed to and did cause each of the Lenders to believe that Pali would act on their behalf.

32.  Notwithstanding the foregoing, however, upon information and belief Pali was given an option to acquire, for a nominal amount, warrants to obtain shares of stock in Renegade.  The amount of stock it would be able to acquire was in direct proportion to the funds raised.  Pali did not disclose this additional compensation in any of the term sheets, PPMs or elsewhere.  In fact it did acquire warrants and did not disclose this to any Lender or prospective lender. Its conflict of interest and financial stake in Renegade was not disclosed.  As is more fully set forth below, that financial stake, among other things, caused Pali to breach its fiduciary duty and permit Renegade to loot the various LLCs, and particularly those to which Lenders had provided funds.

33.  The first LLC created with funds from Lenders brought in by Pali was Pocahontas ATM Fund, LLC.  Pocahontas was a bridge loan of approximately $1.8 million and the transaction was executed in August 2003.

34.  The second LLC created with funds from lenders brought in by Pali was Apache ATM Fund, LLC.  Apache was a one-year note in the amount of $970,000 and the transaction was executed in September 2003.

35.  The third LLC, brought in by Pali and created with funds from Plaintiff FIIN, was Cochise.  Cochise is a 5-year note in the amount of $1.7 million executed in December 2003. Plaintiff FIIN was the Lender to Cochise, the Note holder and the secured party in the transaction.

36.  The fourth LLC, brought in by Pali and created with funds from Plaintiff FENF, was Cherokee, which took out the position of Apache.  Cherokee is a 5-year note in the amount of $1.5 million and was executed in March 2004.  Plaintiff FENF was the Lender to Cherokee, the Note holder and the secured party in the transaction.

37.  The fifth LLC, brought in by Pali and created with funds from lenders, was Geronimo, which took out the position of Pocahontas.  Geronimo is a 5-year note in the amount of approximately $3.5 million and was executed in June 2004.

38.  The sixth LLC, brought in by Pali and created with funds from lenders, was Arapahoe.  Arapahoe is a one-year note in the amount of approximately $1.1 million and was executed in December 2004.

39.  Upon information and belief, the LLCs' only business was to issue certain promissory Notes, acquire and maintain specific ATMs with the proceeds of those Notes, and repay the Notes as due, each for a single, specific transaction.

Discovery of Material Breaches
by Renegade and the LLCs
and Pali's Failure to Act

40.  In or about May, 2004, Tim Magee ("Magee"), a consultant to Pali, discovered that Renegade and the LLCs had been commingling funds, had not created the proper lock box facilities that were required under the loan documents, and had failed to comply with material provisions of the loan documents.  These failures constituted an Event of Default under the

respective Notes and financing documents. Magee reported this to Soroca and Pali, as agents for the lenders (and specifically the Plaintiffs) herein.

41. Magee also reported that Renegade and the LLCs had failed to provide updated financials for the most recent private placement and that no reports were forthcoming from Renegade or the LLCs, all in violation of material provisions of the loan documents. These failures constituted an additional Event of Default under the respective Notes and financing documents.

42. Upon information and belief, Pali took no action to enforce the loan documents, failed to advise any of the Lenders that Renegade and the LLCs were in violation of material provisions of the loan documents or that Events of Default had occurred, and concealed the breaches and defaults from the Lenders. Pali failed to exercise the Lenders' rights against the collateral, the bank accounts and the money generated by the ATMs. Pali failed and refused to take any action against Renegade or the LLCs.

Pali's Conflict of Interest
and Continued Concealment
of Renegade's and Verbic's
Extensive Wrongful Activities

43. Upon information and belief, during the period between May 2004 and January 2005, Pali continued to conceal the breaches by Renegade and the LLCs from the Lenders. With full knowledge that Renegade and the LLCs were in default and not complying with material terms of the loan documents applicable to the Cochise and Cherokee transactions in which Plaintiffs were the Lenders, Pali continued to act as placement agent for two additional transactions, Geronimo and Arapahoe, and to receive fees for the placements and obtain

additional undisclosed compensation consisting of (among other things) a one percent ownership equity interest for each million dollars of capital raised and funded.

44.  In December 2004, Pali introduced Renegade to a large New York hedge fund ("Hedge Fund") for the purpose of securing for Renegade additional funding, for which Pali would have received a fee.  In January 2005, Cochise and Cherokee failed to make payments to the respective Lenders.  Checks that had been issued in payment under the loan documents bounced.

45.  On or about January 18, 2005, Soroca, on behalf of Pali, flew to Arizona to meet with Renegade and to introduce them to senior management and representatives from the Hedge Fund to discuss further the proposed $200 million facility for Renegade.

46.  Upon information and belief, on that day, Soroca was told that Verbic had not used the proceeds from the Arapahoe Fund for the agreed-to purposes.  The funds from Arapahoe were to be used to purchase two portfolios of ATMs (the Gene Rice portfolio and the High's of Baltimore portfolio).

47.  Upon information and belief, Verbic had instead executed two wire transfers from the Arapahoe bank account to his personal account and had issued a check from the Arapahoe bank account to himself, totaling over $100,000, approximately 10% of the total amount contributed by those lenders.  Half of the funds due to Universal Money Center ("UMC"), owner of the High's of Baltimore portfolio, had been wired to UMC only to be wired back to the Arapahoe account by UMC, which had stated it was only going to accept the full amount due for the purchase.  Gene Rice, owner of the other portfolio, received no payment at all from the Arapahoe account.

48.  Upon information and belief, the remaining funds in the Arapahoe account were transferred to other Renegade-controlled accounts and used to pay operating costs.

49.  Upon information and belief, Soroca was also advised that there was a significant amount of evidence, including bank statements, fraudulent invoices, corporate credit card statements, invoices for clearly personal obligations, and the like, demonstrating that because of the failure to ensure that proper lock-box facilities were in place, Verbic and others had continued to have access to money that was collateral of the Lenders and had systematically misappropriated those funds for their personal benefit, used funds to pay improper expenses, and had continued the commingling that had been reported to Soroca and Pali in May 2004.

50.  Upon information and belief, Pali and Soroca were shown documentary evidence that established that Verbic, Renegade and others had systematically misappropriated from the LLC accounts and from funds due to the lenders, including the Plaintiffs, a minimum of six hundred thousand dollars.  Among other things, Soroca was shown the corporate American Express Card statement for James Verbic's card which reflected:

(a)     $21,537.36 in personal, non-business expenses of James Verbic, Brenda Verbic, their children Channing and Sloane Verbic, the childrens' nanny and Roxanna Hernandez (February 14, 2004 American Express Statement).

(b)     $48,993.66 in personal, non-business-related expenses describing purchases including clothing, handbags, women's shoes, sportswear, vacation travel, jewelry, liquor and personal television service, among other things (July 15, 2004 American Express Statement).

(c)     The Renegade General Ledger showing payments of these bills to American
Express from Renegade corporate accounts, not from James Verbic's personal
accounts.

51.  Upon information and belief, Pali and Soroca were shown additional documentary
evidence that established the misappropriation of funds as the result of the failure, among other
things, to create proper lock box facilities. Included in the documents was a list of transactions
from the Renegade Operating Account at First International Bank & Trust ("FIBT").  On
January 31, 2005, a transfer was made between the Geronimo LLC account at FIBT to the
Renegade Operating Account at FIBT in the amount of $5,000, creating a balance of $16,373.43.
On that same day, four transfers to the Renegade Operating Account at FIBT were made by
Lynk, an ATM Processor, totaling $337.90.  On that same day, a check from the Renegade
Operating Account was issued to JTV (James T. Verbic) in the amount of $16,700, leaving a
balance in the Renegade Operating Account of only $11.33.

52.  Upon information and belief, included in the documents shown to Soroca and Pali
were the bank statements for the months of November 2004 and December 2004 for Arapahoe
ATM Fund, LLC at FIBT.   The November statement showed deposits from lenders into the
account totaling $400,000.  In November, there were debit memoranda totaling $22,000 from the
Arapahoe Account to another Renegade Account at FIBT (acct # 7020001801), $7,600 to an
unidentified account at FIBT (acct # 7120003541), and a transfer of $19,000 from the Arapahoe
Account to the Geronimo ATM Fund, LLC Account at FIBT, clearly demonstrating that
Arapahoe lender funds were used to make payments to Geronimo lenders.

53.  The December Arapaho LLC bank statement showed $838,000 deposited from
Lenders.  In December, the Arapahoe LLC Account issued a check payable to "Cash" signed by

14

James Verbic.  Additionally, there were two transfers from the Arapahoe LLC Account made directly to James Verbic's personal account at FIBT (acct # 7110018910) in the amounts of $50,000 and $55,000, respectively.  From the Arapahoe LLC Account, Gene Rice received no payments for his portfolio. UMC received $188,000 which they refused and wired back to the Arapahoe LLC Account declining to transfer the assets until the full portfolio purchase amount was sent.  Upon information and belief, the funds were then distributed to other Renegade-controlled accounts; none of the funds were used as intended and described in the Arapahoe ATM Fund, LLC transaction documents.

54.  Upon information and belief, from January 2003 through December 2004, the Renegade General Ledger listed ATM cash withdrawals and ACH debits, totaling $114,623.37 characterized as "Shareholder Draw."

55.  Upon information and belief, from January 2003 through December 2004, the Renegade General Ledger listed additional "Shareholder Draw" transactions including $4,250 for checks payable to cash, and for checks totaling $17,824.09 to James Verbic's mortgage company, his childrens' nannies and other vendors to Verbic.

56.  Upon information and belief, as of December 31, 2004, the total balance of "Shareholder Draw" listed in the Renegade General Ledger totaled -$436,047.89.

57.  Upon information and belief, on March 31, 2004 a cashier's check drawn on a Renegade Account at FIBT (acct # 7315793088) was used to take Mr. Verbic's house out of foreclosure proceedings.  Accompanying the copy of the cashier's check is a letter from the law firm of Tiffany & Bosco explaining the payment was to reinstate Mr. Verbic's loan #7073633187 relating to Mr. Verbic's personal case, Cendant v. Verbic.

15

58. Upon information and belief, included in the documents shown to Soroca and Pali were two wire transfer memoranda, dated January 12, 2005 and January 24, 2005 from a Renegade-controlled account at Palm Desert National Bank ("PDNB") (supplier of cash to Renegade), to Mr. Verbic's personal account at FIBT totaling $14,500.

59. Upon information and belief, included in the documents shown to Soroca and Pali were invoices and receipts for reimbursements to both James Verbic and Roland Cooper. The documents showed personal expenses paid for with corporate funds. These expenses included: a March 3, 2003 cash reimbursement to Mr. Verbic for a $1,500 invoice from CB Painting and Decorating, for work on Verbic's home; a December 24, 2003 payment of $1,300 to the Shorr Collection and one for $1,000 on February 5, 2004, for art purchased by Mr. Verbic; a payment of $548.59 on February 25, 2004 to Verizon for Brenda Verbic's personal cellphone; a March 1, 2004 payment to Verbic's attorney for services regarding his personal lawsuit with Merrill Lynch; a February 5, 2003 invoice submitted by Roland Cooper for $42,270 for 18 ATMs from Tranax technologies which units, upon information and belief, were never purchased and the documentation for which was falsely created at Renegade; a false February 1, 2004 invoice from ARMO Industries for $1,900 in used equipment (the telephone number listed is 800-795-ARMO; upon information and belief no such company exists); a false April 22, 2003 invoice from ATM Wholesalers for $15,000 in equipment (upon information and belief, no such company exists); a false undated invoice in the amount of $3,130 in equipment from ISIS Wholesalers (the telephone number is for Triple-A Mortgage); and two cash reimbursements to Mr. Verbic from Renegade for ATMs that did not include the name of any vendor. The invoices were on standard purchase order pads that anyone can purchase. The invoices were separated by

16

more than a year but listed consecutive document numbers. Upon information and belief, carbon copies of the receipts and the remaining pad were later located at the Renegade offices.

Pali Acts Belatedly,
Inadequately, and Improperly

60. Eventually, in or about late January 2005, upon information and belief Pali, as agent on behalf of all of the lenders, including Plaintiffs, exercised the rights of the lenders to take control of the collateral and the bank accounts. Pali, among other things, took over the Renegade corporate offices and Soroca confirmed that Verbic and others had misappropriated in excess of $600,000, had failed to create or maintain proper lock box facilities and had violated material terms of the loan documents applicable to each of the lenders, including Plaintiffs. Pali did this by way of self-help and without any court order.

61. Pali did not reveal to any of the lenders the extent of the fraud and misappropriation or the true reasons for the actions that it was taking ostensibly on their behalf. Upon information and belief, it sought to further conceal Verbic's and Renegade's wrongful activities in the hope that it could salvage the enterprise and obtain additional investments to fill the financial gaps that had been created by the fraud, theft and material violations of the loan documents.

Prior Litigations and Pali's
Continued Acting on its Own Behalf Only

62. Upon information and belief, shortly after the Pali takeover of the Renegade offices and accounts, Verbic instituted action in Delaware Chancery Court and obtained a Preliminary Injunction and Temporary Restraining Order against Pali and others ("TRO"). Pali countered by applying for and obtaining a Workplace protection order in Arizona, apparently without telling the Arizona Court of the existence of the Delaware TRO.

17

63. Upon information and belief, Pali refused to relinquish control of the Renegade facilities and bank accounts and Renegade and Verbic applied to and obtained from the Delaware Court an Order to Show Cause why Pali and others should not be held in Contempt for, among other things, violation of the TRO.

64. Upon information and belief, Soroca and Pali, in fear of being held in contempt and subjected to other sanctions, capitulated to Renegade and Verbic and put Pali's interests ahead of those of the lenders and particularly the Plaintiffs.

65. Upon information and belief, on or about February 22, 2005, Pali and the Renegade Defendants entered into a memorandum of understanding ("MOU"). Under the terms of the MOU, Pali acknowledged the validity of the TRO, agreed to abide by any further orders of the Chancery Court, and returned to Verbic all documents and files and permitted Verbic to take over Renegade and continue to run it and each of the LLCs, despite Pali's knowledge that he had looted them previously.

66. Upon information and belief Pali continued to put its interests ahead of those of the lenders and obtained from Renegade an agreement that Pali would be given warrants entitling it to purchase shares representing up to twenty (20%) percent of the ownership interest in a new corporation into which Renegade was going contribute its interests in each of the LLC. In consideration for the warrants, Pali released the Renegade Defendants from all claims that Pali had or could have brought.

The Continuing Cover-up by Pali

67. In response to demands by the Lenders for information and confirmation of the safety of their investment, Pali wrote to each lender for which it acted as agent, including Plaintiffs, and advised each lender that Renegade had not complied with material terms of the

18

loan documents and specifically had not created proper lock box facilities nor had they substituted for underperforming assets.

68. It sought to placate the Lenders by falsely advising them that they had reached a "positive solution" for the Lenders. It falsely represented that its settlement with the Renegade Defendants, in the MOU, would give Pali greater oversight over the LLC and the parent company, would provide greater transparency and would put the Lenders in a stronger financial position than before. It further represented that Renegade's compliance with the conditions of the loan documents, including creating lock box accounts, would be completed in 4-6 weeks. Upon information and belief, Renegade did not comply with the original material provisions of the loan documents and continued to act as before.

69. In truth and fact, the MOU did not give Pali any greater oversight, did not have any means of forcing Renegade to abide by the terms of the loan documents, and returned operation of the company and the LLCs to individuals Pali had already found to be looting the company and the LLCs for their own benefit.

Renegade's Further Breaches and Pali's Further Inaction

70. During December 2003, Pali as investment adviser to Renegade and placement agent under the offering, raised $1,700,000.00 for Cochise from Plaintiff FIIN. Under the terms of the offering, Plaintiff FIIN received a signed promissory Note which provided that Cochise would make interest and principal payments to Plaintiff FIIN in accordance with a schedule appended to the Note.

71. In further consideration for the investment by Plaintiff FIIN, Cochise and Renegade executed a Security and Guarantee Agreement and an Account Control Agreement and Verbic executed a personal guarantee ("Cochise Loan Documents"). Pursuant to the term sheet and

19

offering, ATMs were to be acquired with the proceeds of the investment and it was represented by the Pali and the Renegade Defendants that lock box facilities would be established into which the money generated by the ATMs would be deposited. Under the terms of the Cochise Loan Documents, Plaintiff FIIN was granted, among other things, a security interest in ATMs acquired, the contracts for the installation, operation and maintenance of the ATMs, all fees generated by the ATMs, receivables and payments obtained under contracts relating to the ATMs, and the lock box facility to be established at First International Bank & Trust ("FIBT") into which all ATM fees were to go, as well as a requirement that ATMs that were underperforming would be substituted out of the portfolio.

72. Pali was made the agent for Plaintiff FIIN for the purpose of monitoring the investment, ensuring that all material terms of the Cochise Loan Documents were adhered to and pursuing all remedies against the Renegade Defendants in the event that the material terms of the agreements were not adhered to.

73. During March 2004, Pali as investment adviser to Renegade and placement agent under the offering, raised $1,500,000.00 for Cherokee from Plaintiff FENF. Under the terms of the offering, Plaintiff FENF received a signed promissory Note which provided that Cherokee would make interest and principal payments to Plaintiff FENF in accordance with a schedule appended to the Note.

74. In further consideration for the investment by Plaintiff FENF, Cherokee and Renegade executed a Security and Guarantee Agreement and an Account Control Agreement ("Cherokee Loan Documents"). Pursuant to the term sheet and offering, ATMs were to be acquired with the proceeds of the investment and it was represented by the Pali and the Renegade Defendants that lock box facilities would be established into which the money

20

generated by the ATMs would be deposited.  Under the terms of the Cherokee Loan Documents,

Plaintiff FENF was granted, among other things, a security interest in ATMs acquired, the

contracts for the installation, operation and maintenance of the ATMs, all fees generated by the

ATMs, receivables and payments obtained under contracts relating to the ATMs, and the lock

box facility to be established at FIBT into which all ATM fees were to go, as well as a

requirement that ATMs that were underperforming would be substituted out of the portfolio.

75.  Pali was made the agent for Plaintiff FENF for the purpose of monitoring the

investment, ensuring that all material terms of the Cherokee Loan Documents were adhered to

and pursuing all remedies against the Renegade Defendants in the event that the material terms

of the agreements were not adhered to.

76.  The Cochise Note and the Cherokee Note and the related Loan Documents provided,

in applicable part, that the Notes would be accelerated and all principal and interest would be

due in the event of a default.  The Notes provide, among other things, that an event of default

includes  "[Payor's] default in the due observance or performance of any covenant, condition or

agreement on the part of Payor to be observed or performed pursuant to the term of this Note or

any other Financing Document…" as well as "if all amounts payable to Payor on account of the

ATMs are not deposited in the Payor's account which is subject to the Account Control

Agreement."

77.  Upon information and belief, the lock box facilities that were part of each payor's

obligation were never established and all amounts payable to each payor were not deposited in

the respective required accounts.

78.  Upon information and belief, Pali knew of the above violations and defaults as early

as May 2004, never advised the Plaintiffs of them and did not take any action to accelerate the

Notes or otherwise require the Renegade Defendants to adhere to the respective Loan

Documents, until, at the earliest, January 2005.

COUNT I - SECURITIES FRAUD

(Against all Defendants)

79. Plaintiffs incorporate by reference each of the allegations of paragraphs 1-78 as if set

forth herein in full.

80. From on or about November 2003, the Renegade Defendants and Pali as placement

agent, directly and indirectly, by the use of the means and instrumentalities of interstate

commerce and/or of the mails, used or employed, in connection with the sale of securities, and

particularly the Notes referred to hereinabove, deceptive practices in violation of Section 10(b)

of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder.

81. On or about November 24, 2003, Pali transmitted to representatives of FIIN a

document containing various terms, conditions, statements and representations regarding a

proposed portfolio acquisition loan on behalf of Renegade which would be evidenced by a five

year term Note, which constituted and constitutes a security.

82. From on or about that date until December 2004, Pali and the Renegade Defendants

transmitted documents to representatives of FIIN representing, among other things, that all cash

flow generated by the ATMs purchased with the proceeds of the Portfolio Acquisition Loan

would be deposited into a blocked cash collateral account specific to the transaction, from which

cash, monthly installment of interest and amortization of the Loan would be paid. This

representation was material in that it was designed to induce and did induce FIIN to enter into

the transaction and acquire the Note and led FIIN to believe that the funds would not be

available generally to the Renegade Defendants and would first go towards repayment of the

22

Loan.

83.   FIIN relied on the truth of that representation.  That representation was false when made and it was made with the intent that FIIN rely on the representation.  The Renegade Defendants did not establish the blocked account and had all funds transferred to the general account of Renegade to give them access thereto.  The statement that a blocked account would be created was material and was untrue when made.

84.   From on or about that date until December 2004, Pali and the Renegade Defendants transmitted documents to representative of FIIN representing, among other things, that the sole compensation to Pali as placement agent for the Notes was 6% of the proceeds of the Loans from FIIN.  That representation was material in that it was designed to induce and did induce FIIN to enter into the transaction, acquire the Note and to have Pali act as agent in monitoring the actions of Renegade and Cochise to ensure compliance with the terms of the Financing Documents, enforce FIIN's rights under those documents and take such action as to ensure that the funds from the ATMs that were subject to the security agreement would only go to a segregated account to pay FIIN's Note.

85.   FIIN relied on the truth of that representation.  That representation was false when made and it was made with the intent that FIIN rely on the representation.  In truth and fact, Pali had a contract with the Renegade Defendants by which Pali was paid additional, undisclosed compensation as follows: "As part of its compensation, Client [Renegade] shall deliver to the Advisor [Pali] or its Assignees warrants to purchase common stock or similar equity instrument of Client in an amount equal to one percent (1.0%) ownership of the equity in the Client for every one million dollars ($1,000,000) of capital raised and funded (i.e. 8.0% ownership in

Client after first anticipated tranche of $8,000,000 and 8.0% ownership in client after second tranche of $8,000,000, giving Advisor 16.0% equity ownership in Client)."

86.   Pali knowingly and willfully or with reckless disregard omitted any and all mention of the additional compensation.  That false statement and omitted information was material in that it caused FIIN to believe falsely that Pali was not an owner of or equity participant in Renegade and therefore did not have a conflict or reason to not fully enforce all of FIIN's rights against Renegade.

87.   Upon information and belief, Pali omitted any mention of the additional compensation so that it could and would be appointed agent for FIIN and would thereafter be able to control and filter information that was sent to FIIN as Note holder and permit the Renegade Defendants to not comply with and/or otherwise violate the terms of the financing documents.

88.   Upon information and belief, Pali omitted any mention of the additional compensation so that FIIN would believe that Pali would act on FIIN's behalf and protect its rights as an independent fiduciary.  In truth and fact, Pali's material omission and false representations caused FIIN to believe that Pali was acting as FIIN's agent and ensuring that all of the material terms of the financing statements were being complied with.  Pali's failure to ensure that those material terms were being complied with was the direct and proximate cause of FIIN's damages and loss.

89.   On or about March, 2004, Pali transmitted to representatives of FENF a document containing various terms, conditions, statements and representations regarding a proposed portfolio acquisition loan on behalf of Renegade which would be evidenced by a five year term Note, which constituted and constitutes a security.

24

90. From on or about that date until December 2004, Pali and the Renegade Defendants transmitted documents to representatives of FENF representing, among other things, that all cash flow generated by the ATMs purchased with the proceeds of the Portfolio Acquisition Loan would be deposited in a blocked cash collateral account specific to the transaction, from which cash, monthly installment of interest and amortization of the Loan would be paid. This representation was material in that it was designed to induce and did induce FENF to enter into the transaction and acquire the Note and led FENF to believe that the funds would not be available generally to the Renegade Defendants and would first go towards repayment of the Loan.

91. FENF relied on the truth of that representation. That representation was false when made and it was made with the intent that FENF rely on the representation. The Renegade Defendants did not establish the blocked account and had all funds transferred to the general account of Renegade to give them access thereto. The statement that a blocked account would be created was material and was untrue when made.

92. From on or about that date until December 2004, Pali and the Renegade Defendants transmitted documents to representative of FENF representing, among other things, that the sole compensation to Pali as placement agent for the Notes was 6% of the proceeds of the Loans from FENF. That representation was material in that it was designed to induce and did induce FENF to enter into the transaction, acquire the Note and to have Pali act as agent in monitoring the actions of Renegade and Cherokee to ensure compliance with the terms of the Financing Documents, enforce FENF's rights under those documents and take such action as to ensure that the funds from the ATMs that were subject to the security agreement would only go into a segregated account to pay FENF's Note.

25

93.  FENF relied on the truth of that representation.  That representation was false when made and it was made with the intent that FENF rely on the representation.  In truth and fact, Pali had a contract with the Renegade Defendants by which Pali was paid additional, undisclosed compensation as set forth above.

94.  Pali knowingly and willfully or with reckless disregard omitted any and all mention of the additional compensation.  That false statement and omitted information was material in that it caused FENF to believe falsely that Pali was not an owner of or equity participant in Renegade and therefore did not have a conflict or reason to not fully enforce all of FENF's rights against Renegade.

95.  Upon information and belief, Pali omitted any mention of the additional compensation so that it could and would be appointed agent for FENF and would thereafter be able to control and filter information that was sent to FENF as Note holder and permit the Renegade Defendants to not comply with and/or otherwise violate the terms of the financing documents.

96.  Upon information and belief, Pali omitted any mention of the additional compensation so that FENF would believe that Pali would act on FENF's behalf and protect its rights as an independent fiduciary.  In truth and fact, Pali's material omission and false representations caused FENF to believe that Pali was acting as FENF's agent and ensuring that all of the material terms of the financing statements were being complied with.  Pali's failure to ensure that those material terms were being complied with was the direct and proximate cause of FENF's damages and loss.

97.  Upon information and belief, Renegade, Verbic, and Cochise  represented, among other things, that: (a) the proceeds of the $1,700,000 offering were going to be used to purchase

ATM machines either through the acquisition of existing portfolios of ATMs or through the purchase of new or used ATMs for placement by Renegade and Cochise; (b)  none of the ATMs purchased using Plaintiff FIIN's funds nor the contracts under which they were deployed would be sold, transferred or pledged to another entity until after the loan was repaid; and (c) they would establish a blocked account and would direct that all amounts payable to Cochise on account of the ATMs be paid directly to such account.

98.  Upon information and belief, Renegade, Verbic and Cochise made the representations set forth above knowing that Plaintiff FIIN would rely on the accuracy and truthfulness of the representations and in fact Plaintiff FIIN did so rely.

99.  Upon information and belief, Renegade, Verbic and Cochise, at the time the representations were made, knew that they were not going to established blocked accounts, were not going to direct that all amounts payable to Cochise on account of the ATMs be paid directly into such accounts and knew that they were going to be selling, transferring or pledging ATMs pledged to Plaintiff FIIN to another entity before the loan was repaid.

100.  Upon information and belief, Renegade, Verbic and Cochise did not establish blocked accounts, did not direct that all amounts payable to Cochise on account of the ATMs be paid directly into such account and sold, transferred or pledged ATMs pledged to Plaintiff FIIN to another entity before the loan was repaid.

101.  Upon information and belief, Renegade, Verbic, and Cherokee  represented, among other things, that: (a) the proceeds of the $1,500,000 offering were going to be used to purchase ATM machines either through the acquisition of existing portfolios of ATMs or through the purchase of new or used ATMs for placement by Renegade and Cherokee; (b) none of the ATMs purchased using Plaintiff FENF's funds nor the contracts under which they were deployed would

27

be sold, transferred or pledged to another entity until after the loan was repaid; and, (c) they would establish a blocked account and would direct that all amounts payable to Cherokee on account of the ATMs would be paid directly to such account.

102. Upon information and belief, Renegade, Verbic and Cherokee made the representations set forth above knowing that Plaintiff FENF would rely on the accuracy and truthfulness of the representations and in fact Plaintiff FENF did so rely.

103. Upon information and belief, Renegade, Verbic and Cherokee, at the time the representations were made, knew that they were not going to established blocked accounts, were not going to direct that all amounts payable to Cherokee on account of the ATMs be paid directly into such account and knew that they were going to be selling, transferring or pledging ATMs pledged to Plaintiff FENF to another entity before the loan was repaid.

104. Upon information and belief, Renegade, Verbic and Cherokee did not establish blocked accounts, did not direct that all amounts payable to Cherokee on account of the ATMs be paid directly into such account and sold, transferred or pledged ATMs pledged to Plaintiff FENF to another entity before the loan was repaid.

105. As a direct and proximate result of the conduct set forth above, Plaintiffs FIIN and FENF have suffered damages in an amount to be proven at trial.

## COUNT II - BREACH OF FIDUCIARY DUTY

### (Against Defendant Pali)

106. Plaintiffs incorporate by reference each of the allegations of paragraphs 1-105 as if set forth herein in full.

107. At all times set forth herein Defendant Pali was Plaintiffs' agent. Pali confirmed that agency in writing and represented that it had taken and would continue to take action on

28

behalf of Plaintiffs to protect their investments.

108. Pali's agency and fiduciary duties to Plaintiffs predated any agency or fiduciary duties that it undertook to the Geronimo lenders or the Arapahoe lenders and, to the extent that there is or was any conflict, Pali was required to put Plaintiffs' interests ahead of those of any subsequent lender groups.

109. Pali, as agent for the lenders to each of the LLCs, and more particularly to the Plaintiffs as Lenders to Defendants Cochise and Cherokee, had fiduciary duties to, among other things, (a) ensure that the security for the Notes, and particularly the ATMs that served as collateral security, was in place prior to the closing and release of the Notes for sale, (b) ensure that a segregated account was established for each LLC for the benefit of the Lender so that the funds generated by the use of the ATMs was deposited into that segregated account, (c) ensure that security for the Notes remained in place or was appropriately substituted under the terms of the security agreement, (d) enforce the rights of each Lender and control, monitor and otherwise ensure that the funds did go into segregated accounts, and (e) take such timely action as was necessary to enforce each Lender's rights and protect each Lender's security.

110. Pali breached its duties by failing, after having actual and direct knowledge of Renegade's breaches and defaults, to ensure that segregated accounts were maintained and that security for the Notes was maintained; and by failing to take timely action to enforce and protect each Lender's rights and security.

111. Upon information and belief, Pali breached its duties by aiding and abetting the Renegade Defendants in transferring ATMs from Plaintiffs to the Geronimo lender group before the loans to the Plaintiffs were paid in full.

112. Upon information and belief, Pali has continued to breach its fiduciary duties to the

Plaintiffs by initiating litigation on behalf of the lenders in the Geronimo and Arapahoe

transactions and seeking to obtain for those lenders ATMs and funds that were pledged and

otherwise belong to the Plaintiffs, and by otherwise putting the interests of those lenders, which

include Bradley Reifler, the CEO of Pali, and Soroca, a principal of Pali, ahead of the interests of

Plaintiffs.

113.  Pali further breached its duties to Lenders by entering into an undisclosed

compensation agreement to receive warrants to acquire up to a twenty percent interest in

Renegade and a subsequent agreement with Renegade to receive warrants to acquire shares

representing up to twenty percent of a new company into which Renegade would transfer all of

its interest in the four LLCs previously placed by Pali (Arapahoe, Cherokee, Cochise and

Geronimo), thus giving it a proprietary interest in conflict with its fiduciary duty to the Lenders.

Pali concealed its actions and placed its financial gains ahead of its duties as an agent of the

Lenders.

114.  Pali further breached its fiduciary duty by misrepresenting the nature and extent of

the fraud and theft that had been committed by the Renegade Defendants so that, upon

information and belief, it could attempt to infuse additional funds into the Renegade Defendants

and thereby conceal the fraud and theft of which it was aware.

115.  As a direct and proximate result of the conduct set forth above, Plaintiffs FIIN and

FENF have suffered damages in an amount to be proven at trial.

## COUNT III - FRAUD

(Against all Defendants other than Pali)

116.  Plaintiffs incorporate by reference each of the allegations of paragraphs 1-115 as if

set forth herein in full.

30

117.  Upon information and belief, Renegade, Verbic, and Cochise  represented that the proceeds of the $1,700,000 offering were going to be used to purchase ATM machines either through the acquisition of existing portfolios of ATMs or through the purchase of new or used ATMs for placement by Renegade and Cochise.

118.  Upon information and belief, it was represented that none of the ATMs purchased using Plaintiff FIIN's funds nor the contracts under which they were deployed would be sold, transferred or pledged to another entity until after the loan was repaid.

119.  Upon information and belief, it was represented that Renegade, Verbic and Cochise would establish a blocked account and would direct that all amounts payable to Cochise on account of the ATMs would be paid directly to such account.

120.  Upon information and belief, Renegade, Verbic and Cochise made the representations set forth in the two preceding paragraphs knowing that Plaintiff FIIN would rely on the accuracy and truthfulness of the representations and in fact Plaintiff FIIN did so rely.

121.  Upon information and belief, Renegade, Verbic and Cochise, at the time the representations were made, knew that they were not going to established blocked accounts; were not going to direct that all amounts payable to Cochise on account of the ATMs be paid directly into such account and knew that they were going to be selling, transferring or pledging ATMs pledged to Plaintiff FIIN to another entity before the loan was repaid.

122.  Upon information and belief, Renegade, Verbic and Cochise did not establish blocked accounts; did not direct that all amounts payable to Cochise on account of the ATMs be paid directly into such account; and sold, transferred or pledged ATMs pledged to Plaintiff FIIN to another entity before the loan was repaid.

123.  Upon information and belief, Renegade, Verbic, and Cherokee represented that the

31

proceeds of the $1,500,000 offering were going to be used to purchase ATM machines either through the acquisition of existing portfolios of ATMs or through the purchase of new or used ATMs for placement by Renegade and Cherokee.

124.  Upon information and belief, it was represented that none of the ATMs purchased using Plaintiff FENF's funds nor the contracts under which they were deployed would be sold, transferred or pledged to another entity until after the loan was repaid.

125.  Upon information and belief, it was represented that Renegade, Verbic and Cherokee would establish a blocked account and would direct that all amounts payable to Cherokee on account of the ATMs would be paid directly to such account.

126.  Upon information and belief, Renegade, Verbic and Cherokee made the representations set forth in the two preceding paragraphs knowing that Plaintiff FENF would rely on the accuracy and truthfulness of the representations and in fact Plaintiff FENF did so rely.

127.  Upon information and belief, Renegade, Verbic and Cherokee, at the time the representations were made, knew that they were not going to established blocked accounts; were not going to direct that all amounts payable to Cherokee on account of the ATMs be paid directly into such account; and knew that they were going to be selling, transferring or pledging ATMs pledged to Plaintiff FENF to another entity before the loan was repaid.

128.  Upon information and belief, Renegade, Verbic and Cherokee did not establish blocked accounts; did not direct that all amounts payable to Cherokee on account of the ATMs be paid directly into such account; and sold, transferred or pledged ATMs pledged to Plaintiff FENF to another entity before the loan was repaid.

129.  As a direct and proximate result of the conduct set forth above, Plaintiffs FIIN and

FENF have suffered damages in an amount to be proven at trial.

## COUNT IV - BREACH OF CONTRACT

(Against all Defendants other than Pali)

130.  Plaintiffs incorporate by reference each of the allegations of paragraphs 1-129 as if set forth herein in full.

131.  Enforceable contracts existed between Plaintiffs FIIN and FENF on the one hand, and Cochise ATM Fund, LLC, Cherokee ATM Fund, LLC and Renegade on the other hand as the result of the security agreements executed as part of the financing documents.

132.  Renegade, Cochise and Cherokee failed to make timely payments under the respective Notes in accordance with the schedule of payment dates set forth therein; upon information and belief, sold, transferred, alienated or otherwise disposed of ATMs, granted security interest in ATMs pledged to Plaintiffs to other persons and entities, permitted liens to be attached to the ATMs, failed to maintain proper books of account in which its financial transactions were duly and properly recorded, failed to direct all proceeds from the ATMs to a blocked account at FIBT, and failed to pay principal and interest on other Notes, each of which constitutes an Event of Default under each of the Notes.

133.  Because an Event of Default has occurred, the Notes are accelerated and therefore are entirely due and payable in full.

134.  Plaintiffs were granted and hereby demand a security interest in the limited liability company membership interests of Cochise and Cherokee and all proceeds of such property in any form.

135.  Because of the breaches by the Renegade Defendants of the Security Agreements and the cross default under other Notes and Security and Guarantee Agreements, Plaintiffs have

a lien on all collateral for the amount of the outstanding debt and all pre and post judgment interest.

136.  As a direct and proximate result of the conduct describe more fully set forth above, the Plaintiffs have suffered damages in an amount to be proven at trial, together with reasonable attorneys' fees and costs.

<u>COUNT V - NEGLIGENCE</u>

(Against Defendant Pali)

137.  Plaintiffs incorporate by reference each of the allegations of paragraphs 1-136 as if set forth herein in full.

138.  From on or about November 2003 to and including the present, Pali was authorized to act and did act as agent for Plaintiffs FIIN and FENF in conjunction with the investments made by each of them in Cochise and Cherokee respectively.

139.  From on or about November 2003 to and including the present, Pali in its fiduciary capacity as agent for Plaintiffs was authorized to, and had a duty to, pursue remedies under the Cochise and Cherokee Notes, pursue remedies under the Guarantees by Renegade and Verbic of those Notes, ensure that the proceeds of the loans were used in accordance with the representations made in the term sheet, Note, and Financing Documents, and otherwise take such action as was reasonably required to ensure the payments under the Notes and the security of the Collateral which was pledged, including, without limitation, the ATMs and the lock box facilities for the proceeds therefrom.

140.  Pali, as agent for the Plaintiffs, was authorized to, and had a duty to, among other things, (a) ensure that the security for the Notes, and particularly the ATMs that served as collateral security, was in place prior to the closing and release of the Notes for sale, (b) ensure

that a segregated account was established for each LLC for the benefit of the Lender so that the funds generated by the use of the ATMs was deposited into that segregated account, (c) ensure that security for the Notes remained in place under the terms of the security agreement, (d) enforce the rights of each Lender and control, monitor and otherwise ensure that the funds did go into segregated accounts, and (e) take such timely action as was necessary to enforce each Lender's rights and protect each Lender's security.

141.  Pali was negligent by failing, after having express and direct knowledge of Renegade's breaches and Events of Default, to ensure that segregated accounts were maintained and that security for the Notes was maintained, and by failing to take timely action to enforce and protect each Lender's rights and security.

142.  Upon information and belief, Pali also was negligent in that it aided and abetted the Renegade Defendants in transferring ATMs from Plaintiffs to the Geronimo lender group before the loans to the Plaintiffs were paid in full.

143.  Pali was further negligent in that it failed to properly represent and/or report the nature and extent of the fraud and theft that had been committed by the Renegade Defendants; entered into agreements with them, after knowing of the theft and fraud, that did not have proper oversight mechanisms; did not provide for the protection of the collateral security that had been pledged to the Plaintiffs; did not cure any of the material breaches of the Financing Documents of which Pali was then aware; and failed to act in a reasonable manner with regard to assets which were the subject of the loans by the respective Plaintiffs.

144.  As a direct and proximate result of the conduct set forth above, Plaintiffs FIIN and FENF have suffered damages in an amount to be proven at trial.

## COUNT VI - CONVERSION

### (Against all Defendants other than Pali)

145.  Plaintiffs incorporate by reference each of the allegations of paragraphs 1-144 as if set forth herein in full.

146.  Upon information and belief, Cochise, Renegade and/or Verbic did not use all of the proceeds of the sale of the Notes issued to FIIN to acquire the promised ATMs, but instead used a substantial portion of those proceeds to pay unrelated and unauthorized expenses of Renegade and Cochise and personal expenses and bills of the Verbics.

147.  Upon information and belief, Cherokee, Renegade and/or Verbic did not use all of the proceeds of the sale of the Notes issued to FENF to acquire the promised ATMs, but instead used as substantial portion of those proceeds to pay unrelated and unauthorized expenses of Renegade and Cherokee and personal expenses and bills of the Verbics.

148.  Under the respective Notes, Security Agreements, Guarantees and Account Control Agreements executed by the various Renegade Defendants, all proceeds of each and every ATM transaction were to be paid into segregated, controlled bank accounts with lock box facilities to be used to pay the Lenders in accordance with the terms and schedules of their respective Notes.

149.  Upon information and belief, the Renegade Defendants have diverted fees due and payable to Plaintiffs FIIN and FENF to their own use to pay expenses, personal debts and bills, and otherwise have unlawfully converted and exercised illegal dominion and control over those funds, in violation of the Financing Documents and the Notes.

150.  Upon information and belief, the Renegade Defendants have double-pledged ATMs, removed ATMs from their original designated locations and hidden their current whereabouts, diverted the fees from those ATM machines to their own use to pay other expenses

and personal debts rather than paying FIIN and FENF under the Notes, and have exercised illegal dominion and control over those machines, in violation of the Financing Documents and the Notes.

151. Upon information and belief, the Renegade Defendants have disposed of, sold, hypothecated, and otherwise impaired the ATMs and other collateral security pledged to FIIN and FENF to pay other expenses and personal debts rather than paying FIIN and FENF under the Notes.

152. As a result and by virtue of the above conduct and other conduct unknown to the Plaintiffs at this time, the Renegade Defendants have willfully, intentionally, wrongfully and unlawfully deprived the Plaintiffs of their funds and the collateral security pledged to them, have exercised unlawful dominion and control over funds that belong to Plaintiffs, and have otherwise converted funds and assets belonging to Plaintiffs.

153. Upon information and belief, the Verbics engaged in conduct constituting conversion on behalf of themselves and as agents and representatives of Renegade, Cochise, Cherokee and the other LLCs and are jointly and severally liable for the actions of one another.

154. As a direct and proximate result of the conduct set forth above, Plaintiffs FIIN and FENF have suffered damages in an amount to be proven at trial.

COUNT VII - FRAUDULENT CONVEYANCE

(Against All Defendants)

155. Plaintiffs incorporate by reference each of the allegations of paragraphs 1-154 as if set forth herein in full.

156. The Plaintiffs are creditors of the Renegade Defendants by and through the Notes, Security Agreements, Guarantees, and Account Control Agreements.

37

157.  Upon information and belief, the Renegade Defendants entered into and conducted fraudulent conveyances and transferred ATMs, assets and funds and otherwise incurred fraudulent debts, expenses and obligations.  All such transfers, conveyances and  obligations are fraudulent and Plaintiffs are not bound thereby and are entitled to have them put aside.

158.  Upon information and belief, the Renegade Defendants combined, conspired, confederated and agreed to make and have in fact made transfers and incurred obligations with the intent to defraud Plaintiffs and to deny, delay, prevent, hinder and otherwise cause the non-payment of the debts owed to and due the Plaintiffs.

159.  Upon information and belief, Pali combined, conspired, aided and abetted the Renegade Defendants in the transfers, creation of obligations and re-pledging of assets previously pledged to Plaintiffs with knowledge that the Renegade Defendants were in breach of material provisions of the loan documents and that the loans were then in default and accelerated.

160.  Upon information and belief, the Defendants combined and conspired to engage in fraudulent conveyances involving the ATMs and other assets and the funds and fees, all of which were the pledged property of the Plaintiffs, without receiving reasonably equivalent value for the conveyance.  Upon information and belief, the transfers were intended to and did result in transactions such that the remaining assets of the business were unreasonably small with respect to the business or transaction and/or that the debts incurred or intended to be incurred were beyond their ability to pay as they became due.

161.  As a direct and proximate result of the conduct set forth above, Plaintiffs FIIN and FENF have suffered damages in an amount to be proven at trial.

162.  Plaintiffs are also entitled to a constructive trust over all such assets and an

equitable lien on all such property and to have delivered back to them any and all property that was the subject of the fraudulent transfers, conveyances or encumbrances.

COUNT VIII - JUDICIAL FORECLOSURE

(Against All Defendants)

163.  Plaintiffs incorporate by reference each of the allegations of paragraphs 1-162 as if set forth herein in full.

164.  Plaintiffs FIIN and FENF seek equitable relief by way of an order of judicial foreclosure of their respective security interests in the collateral, funds, and all other assets of the Renegade Defendants and in the collateral, funds, ATMs and other assets being held constructively or actually by Pali on behalf on the lenders in each and every other transaction.

165.  Plaintiffs FIIN and FENF request specific performance and an order requiring delivery by the Renegade Defendants and Pali of possession and all right, title and interest in and to all of the ATM machines and contract relating thereto which were and are the subject of the security interests filed at the time of the issuance of the respective Notes, all funds received therefrom, all fees attributable thereto, all accounts at the First International Bank & Trust, all membership interests in Cochise and Cherokee, all contracts, lists, or other documents relating to or indicating the current locations of each of the ATMs, and all other contract or documents with any and all service provider, banks or locations regarding or relating to the ATMs.

166.  Plaintiffs have no adequate remedy at law.

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

a)      Compensatory damages, including unjust enrichment, in an amount to be determined at trial, but in no event less than the outstanding principal and interest on each Note;

39

b)      An award of reasonable attorneys' fees;

c)      All costs of the proceeding herein, along with pre and post judgment interest;

d)      Specific performance under the Security Agreements and Guarantees in
accordance with their terms;

e)      An Order directing Cochise ATM Fund, LLC, Cherokee ATM Fund LLC,
Renegade Technology Group, Inc., James Verbic and Pali Capital, Inc. to deliver
to Plaintiffs forthwith all title in and actual possession of all ATM machines
identified in the original UCC-1 filing and all machines substituted thereunder,
funds and fees received by and through the ATM machines, all contracts relating
to the ATM machines and all accounts at First International Bank & Trust or at
any other location that relate to any of the ATM machines or into which funds or
fees from the ATM machines have gone;

f)      An Order directing Cochise ATM Fund, LLC, Cherokee ATM Fund LLC,
Renegade Technology Group, Inc., James Verbic and Pali Capital, Inc. to deliver
to Plaintiffs all membership interests in Cochise and Cherokee that were provided
as security under the respective Security Agreements and under the Guaranty and
Security Agreements;

g)      An Order directing  Cochise ATM Fund, LLC, Cherokee ATM Fund LLC,
Renegade Technology Group, Inc., James Verbic and Pali Capital, Inc. to deliver
to Plaintiffs a list of all ATM locations and original contracts for the ATMs with
all service providers, banks, processors or other third parties;

h)      An Order foreclosing the security interests in all collateral pledged, at any time, to
FIIN and FENF;

i)      An Order directing that Pali, as agent for the Geronimo lenders and the Arapahoe lenders, deliver to Plaintiffs forthwith all title to and actual possession of all ATM machines transferred to the lenders that were originally pledged as collateral to FIIN or FENF, funds and fees received by and through those ATM machines, all contracts relating to those ATM machines and all accounts at First International Bank & Trust or at any other location that relate to any of those ATM machines or into which funds or fees from those ATM machines have gone;

j)      An Order that the collateral be sold and that the proceeds of the sale be applied to satisfy and repay the liens, Notes and all money otherwise owed to Plaintiffs;

k)      An Order setting aside any fraudulent conveyances and transferring the assets so conveyed to Plaintiffs;

l)      An Order creating a constructive trust and/or equitable lien on any and all real or personal property of the Defendants obtained through or as the result of the wrongful conduct set forth herein;

m)      Punitive and exemplary damages in an amount to be determined at trial; and

n)      Such other and further relief as the Court deems just and proper under the circumstances.

Dated: March 24, 2006

GERSTEN SAVAGE LLP
Attorneys for Plaintiffs

By: _____

Robert S. Wolf (RW-9711)
James D. Fornari (JF-3433)
600 Lexington Avenue

41

New York, New York 10022
(212) 752-9700